**N THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| RLI INSURANCE COMPANY/ | ) | |
| PLAINTIFF/COUNTERCLAIM | ) | |
| DEFENDANT | ) | |
| | ) | |
| vs. | ) | Case No.: 2:07-cv-00230-WKW-SRW |
| TOWN OF MOSSES, ALABAMA, and | ) | |
| ALICIA SHUFORD-GORDON, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF RLI INSURANCE COMPANY'S DEPOSITION DESIGNATIONS

COMES NOW the Plaintiff, RLI Insurance Company, by and through its counsel of record, and hereby offers the following deposition testimony it may offer at trial in the above-referenced action:

1.     Deposition of Mayor William Scott: PP. 6-7, ll. 20-15; P. 9, ll. 12-20; P. 16, ll. 7-19; P. 23, ll. 11-14; PP. 35-36, ll. 15-23; P. 37, ll. 1-20; P. 38, ll. 10-22; PP. 38-39, ll. 23-9; P. 41, ll. 1-9; P. 44, ll. 1-20; P. 45, ll. 5-21; PP. 66-67, ll. 18-2; PP. 67-68, ll. 10-21; PP. 68-69, ll. 23-14; PP. 70-71, ll. 19-7; PP. 73-74, ll. 18-15; P. 77, ll. 5-10; P. 78, ll. 8-23; P. 114, ll. 18-19; PP. 117-118, ll. 21-7; PP. 119-120, ll. 18-15; PP. 120-121, ll. 16-12; and P. 122, ll. 2-4.

2.     This Plaintiff reserves the right to introduce deposition testimony of this and any other witness or party for the purposes of impeachment and/or rehabilitation.

s/ W. Christopher Waller, Jr.
W. CHRISTOPHER WALLER, JR. (WAL187)
Attorney for Plaintiff/Counterclaim Defendant

OF COUNSEL:
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109
Telephone:  334-387-7680
Facsimile:  334-387-3222
Email:  CWaller@ball-ball.com

### CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2008, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

Collins Pettaway Jr.
Chestnut Sanders Sanders Pettaway & Campbell, L.L.C.
P. O. Box 1290
Selma , AL 36702-1290

Alicia Shuford Gordon
124 Chisholm Street
Hayneville, Al 36040

s/ W. Christopher Waller, Jr.
W. CHRISTOPHER WALLER, JR. (WAL187)

1.

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

RLI INSURANCE COMPANY,

      Plaintiff/Counterclaim Defendant,

vs.                   CIVIL ACTION NO.
                      2:07-cv-00230-WKW-SRW

TOWN OF MOSSES, ALABAMA, and
ALICIA SHUFORD-GORDON,

      Defendants/Counterclaim Plaintiffs,

    \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF WILLIAM SCOTT**, taken
pursuant to stipulation and agreement before Tracye
Sadler, Certified Court Reporter and Commissioner
for the State of Alabama at Large, at the Mosses
Town Hall, 1 Mosses Park Circle, Mosses, Alabama,
on October 1, 2007, commencing at approximately
8:20 a.m.

    \* \* \* \* \* \* \* \* \* \* \* \* \*

6

1    Q.

2

3    A.

4    Q.

5    A.

6    Q.

7    A.

8    Q.

9    A.

10   Q.

11   A.

12   Q.

13

14   A.

15   Q.

16

17

18

19   A.

20   Q.    And you're the mayor of the town, the

21        current mayor?

22   A.    Yes, I am.

23   Q.    How long have you been mayor?

7

1    A.    I've been mayor since October 2004.

2    Q.    How did you come to -- were you elected?

3    A.    Yes, sir.

4    Q.    Who did you beat?

5    A.    I ran against Walter Hill.

6    Q.    And prior to being mayor were you on the

7          city council?

8    A.    Yes.

9    Q.    How many years?

10   A.    Eight.

11   Q.    So roughly you got on in '96?

12   A.    Yes, sir.

13   Q.    The entire time that Ms. Gordon -- and you

14         know who I'm talking about, Alicia Gordon?

15   A.    Yes.

16   Q.

17

18

19   A.

20   Q.

21   A.

22

23

9

1   A.

2   Q.

3   A.

4   Q.

5

6   A.

7   Q.

8

9   A.

10  Q.

11  A.

12  Q.   And then Walter Hill was the mayor from

13       September '96 through October 2004?

14  A.   Yes.

15  Q.   How many city council positions are there?

16  A.   Five.

17  Q.   Five.  Do you know what I'm talking about

18       when I ask you do y'all use the

19       mayor-council form of government?

20  A.   Uh-huh (positive response).

21  Q.

22

23  A.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

16

1

2    A.

3

4    Q.

5

6    A.

7    Q.    All right.  At the time Ms. Gordon was the

8          clerk is it fair to say that the city was

9          set up the same way?

10               And what I mean by that is, did you

11         only have five council people, a mayor, a

12         police chief, and a city clerk?  Were those

13         the only city employees at that time?

14   A.    Yes.

15   Q.    At any other time that you're aware of have

16         you had any additional employees other than

17         the ones that we've talked about?

18   A.    Just part-time officers.  Part-time

19         officers.

20   Q.

21

22   A.

23

23

1

2

3

4

5    A.

6    Q.

7    A.

8

9

10

11    Q.    And then, of course, you also had eight

12          years of experience on the city council

13          prior to becoming mayor?

14    A.    Yes, I did.

15    Q.

16

17

18

19

20

21    A.

22    Q.

23

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

35

1

2  Q.

3

4  A.

5  Q.

6

7

8  A.

9  Q.

10

11  A.

12  Q.

13

14  A.

15  Q.  Tell me now kind of how you handle your

16      city finances -- or actually how the city

17      goes about paying its bills now.

18  A.  Now currently?

19  Q.  Right.

20  A.  Is whenever the bills come in and -- what

21      we usually do is bring an accounts payable

22      list to the council and then they approve

23      them and then they'll pay or either if it's

36

```
 1        something that needs to be paid, they'll
 2        ratify it once it comes to the meeting.
 3    Q.  And that's not the way that it's always
 4        worked?
 5    A.  No.
 6    Q.  When did y'all change to this particular
 7        rule?
 8    A.  We did that after I took office in 2004.
 9    Q.  Who's got -- currently who could write a
10        check on behalf of the city?
11    A.  Me and Councilman Hill were the two
12        authorized signers that are on the account.
13    Q.  Who would cut the check, actually write the
14        check out?
15    A.  It used to be the clerk, Ms. Hester, would
16        do it.
17    Q.  But now either you or Mayor Hill -- I
18        mean --
19    A.  Mr. Hill.
20    Q.  Mr. Hill?
21    A.  Yes, since we had cutbacks.
22    Q.  Y'all both have to sign the check?
23    A.  Yes.  That's required by the city.
```

37

```
1    Q.   Now, when Ms. Gordon was here, how did

2         y'all pay bills?

3    A.   It was where they -- she was responsible

4         for the mail and also paying the bills and

5         doing the financial statement.  So a

6         similar way.  When the bills came in, the

7         bills got paid depending on the

8         availability of funds at that time.

9    Q.   Would she bring an accounts payable list to

10        a city council meeting like y'all do now?

11   A.   No.  We didn't have that in place.

12   Q.   Now, you said that she would pay bills

13        based upon the availability of funds.

14        Would there ever be a time when she would

15        get a bill in and there may not be enough

16        money to, say, pay a certain bill and she

17        might have to wait a couple of weeks?

18   A.   We did have that problem a couple of times

19        back in the past during that

20        administration.

21   Q.

22

23   A.
```

38

1    Q.

2

3    A.

4    Q.

5

6    A.

7    Q.

8

9    A.

10    Q.    When Ms. Gordon was here, could she just

11          write a check and sign it herself?

12    A.    She used to be a signer on the check, but

13          that did change.

14    Q.    All right.  You also say that now y'all

15          have to have two signers.  At that time --

16    A.    Two were still required.

17    Q.    Two were still required?

18    A.    Yes.

19    Q.    So even though she could cut a check and

20          sign it, she would have to get somebody

21          else to sign it as well?

22    A.    Yes.  Yes.

23    Q.    And would she pay bills on -- like would

39

1    she get the mail and see that the light

2    bill needs to be paid and pay it on her own

3    volition or would she have to take that

4    light bill to the council and have y'all

5    approve it and then pay it then?

6 A.    No.  The first one you said, that she would

7    pay the bill when it came in, you know,

8    when she got the bill.  She did not have to

9    get approval from the council.

10 Q.

11

12

13

14

15

16

17

18

19 A.

20

21

22

23

41

1  A.    Well, that our clerk that we had that took

2        the position needed to be trained.  So for

3        the first period of a couple of months I

4        assisted the new clerk, Ms. Hester, with

5        doing the financial statement.  And all

6        mail was picked up by me --

7  Q.    Okay.

8  A.    -- and reviewed and then turned in to the

9        clerk to be processed.

10  Q.

11

12

13  A.

14  Q.

15

16

17

18

19

20  A.

21  Q.

22

23  A.

44

1         After Ms. Gordon left, was it still the

2      clerk's responsibility to reconcile the

3      bank statement or did you look at them

4      or --

5  A.   What happened was when I would get the

6      mail, I would go through the bank

7      statements to see what checks had cleared

8      that I knew I had signed and make sure that

9      any checks that weren't signed had not

10     cleared the bank.  And then we give it to

11     the clerk for her to reconcile and I review

12     them at a later date.

13  Q.   Prior to Ms. Gordon leaving do you know if

14     the mayor ever went back and looked at

15     these bank statements or looked back at her

16     reconciliation work or --

17  A.   I'm not even sure.

18  Q.   You don't know?

19  A.   I know he had the authority to, if

20     necessary, but I'm not sure what he did.

21  Q.

22

23

45

1    A.

2

3

4

5    Q.    Do you think the council should have looked

6           at these bank statements to make sure that

7           they were correct when Ms. Gordon was here?

8                    MR. PETTAWAY:  Let me object to

9                        the form of the question.  You

10                     can still answer.

11    Q.    That's just an objection between the two of

12           us to take up later.  You can answer the

13           question.  It's lawyer talk between us.

14           Don't worry about it.

15                    MR. PETTAWAY:  Do you think that

16                     the council should have looked

17                     at the bank statements?

18    A.    I say no.

19    Q.    Okay.

20    A.    That was the purpose of the financial

21           statements.

22    Q.

23

66

1

2

3

4

5

6

7

8    A.

9    Q.

10

11   A.

12

13   Q.

14

15

16

17   A.

18   Q.    Now, under this proof of loss form you're

19         supposed to tell the company what the

20         principal, or Ms. Gordon, did wrong.  Is

21         that fair?

22   A.    Uh-huh (positive response).

23   Q.    And is that your understanding of the

67

```
 1          purpose of submitting this form?
 2    A.    Uh-huh (positive response).
 3    Q.
 4
 5
 6    A.
 7    Q.
 8
 9    A.
10    Q.    And it looks like somebody wrote it out --
11          wrote out an answer to that.  Would you
12          agree with that?
13    A.    Yeah.
14    Q.    Is that your handwriting?
15    A.    No.  That's my clerk.
16    Q.    Clerk.  Okay.
17    A.    Yeah.
18    Q.    What did she write down there that
19          Ms. Gordon did wrong?
20    A.    It's payment of salary instead of payment
21          of debt.  Incurred new debt even though
22          there was an outstanding debt.
23    Q.    Okay.  Can you tell me -- is that your
```

68

1      clerk's -- did you tell her to write that

2      phrase, those two sentences?

3   A.   Maybe not exactly in those words, but

4      that's what we came up with as far as

5      looking at what information we had to file

6      against the bond.

7   Q.   Tell me what that phrase or two

8      sentences -- what that means.

9   A.   In other words, that she paid payroll as

10      far as -- checks on, you know, payroll or

11      whatever instead of paying the debt that

12      was owed on the town.

13  Q.   So is it fair to say that your claim in

14      this particular instance is that Ms. Gordon

15      paid payroll instead of paying other debts

16      that were owed by the town?

17             MR. PETTAWAY:   Object to the form

18                of the question.

19  A.   Yes.

20  Q.   That's your claim?

21  A.   Yes.

22

23  Q.   Do you have any other claims that you want

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

69

1        to submit under this bond?

2   A.   Just as it states on here.

3   Q.   So that's the only claim you're submitting?

4              MR. PETTAWAY:  Object to the form

5                of the question.

6   A.   Yeah.  Because that ties into everything

7       dealing with our unpaid taxes.

8   Q.   All right.  Tell me how that ties into it.

9   A.   That's covered up under payment of debt.

10   Q.   Okay.

11   A.   And then when we say incurred new debt,

12       meaning that we had outstanding debt that

13       was already in place that you didn't pay

14       but kept incurring new debt.

15   Q.

16   A.

17

18

19

20

21

22

23

70

1    Q.

2    A.

3

4

5

6

7

8    Q.

9

10

11

12

13

14

15

16   A.

17

18

19   Q.    I understand.  Got you.  So you're making

20        two claims rather than one.  That she paid

21        payroll taxes rather than expenses that the

22        town incurred, would that be number one?

23                MR. PETTAWAY:  Object to the form.

71

1   A.   All that's really under the same -- where

2        it says payment of salary instead of

3        payment of debt, you know, being current

4        and outstanding.

5   Q.   Okay.  And then she also incurred new debt

6        while there was old debt out there?

7   A.   Yeah.  So --

8   Q.

9

10  A.

11

12

13

14

15

16  Q.

17

18

19

20

21

22

23  A.

73

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18   Q.   Well, let me -- do you know where there's a
19        law that says that you pay debt rather than
20        city employees?
21   A.   I'm not sure of a law that states that, but
22        I know that in general accounting principle
23        you pay old debt before you incur new debt.
```

74

1    Q.    So you're basing this on GAAP, generally

2          accepted accounting principles.  Is that

3          what you're basing this on?

4    A.    To a certain degree.

5    Q.    To a certain degree.  Then that means that

6          there's something else out there that

7          you're basing it on.  Would you agree with

8          that?

9    A.    Yes.

10   Q.    So you're basing it on generally accepted

11         accounting principles and what else?

12   A.    As far as that -- my experience as far as

13         dealing with that if we can't pay a hundred

14         dollars, why would we incur another cost of

15         a hundred dollars.

16   Q.

17   A.

18

19

20   Q.

21

22

23

77

1    A.

2    Q.

3

4    A.

5    Q.    Let me ask you this, Mayor.  This might

6          help us out.  So other than changing the

7          amount of the taxes that you actually had

8          to pay, is there any other adjustments to

9          this claim that you want to make?

10   A.    No.

11   Q.

12

13   Q.

14

15   A.

16

17

18   Q.

19   A.

20   Q.

21   A.

22

23

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

78

Q.

A.

Q.    Now, in this summary sheet it looks like to
      me you've made five separate claims under
      this bond; is that correct?

A.    Five separate -- you talking about
      different lines as far as --

Q.    Yeah.  Like one for outstanding bills?

A.    Uh-huh (positive response).

Q.    One that you classified as attorney fees?

A.    Uh-huh (positive response).  Yes.

Q.    One that you've classified as taxes
      payable?

A.    Uh-huh (positive response).

Q.    A separate entry for tax consultant?

A.    Yes.

Q.    And a bookkeeping entry?

A.    Yes.



114

1    A.

2    Q.

3    A.

4    Q.

5    A.

6

7    Q.

8

9    A.

10

11

12

13   Q.

14

15   A.

16

17

18   A.    Fiscal year.  Ours runs October 1 through

19         September 30.

20   Q.

21

22

23

117

1

2

3

4   A.

5

6   Q.

7   A.

8   Q.

9

10

11

12

13

14

15

16   A.

17

18

19

20

21   Q.   But this is my question:  Tell me how RLI

22       Insurance Company or anybody acting on

23       their behalf has not investigated this

118

1          claim prior to this lawsuit.

2    A.    I can't think of an exact instance, but I

3          know as far as that, you know, we submitted

4          all the information and, you know, asked

5          for the bonding company to, you know,

6          fulfill their obligation based on the

7          information.

8    Q.

9    A.

10

11   Q.

12

13

14

15

16

17

18   A.

19

20

21   Q.

22

23

119

1     A.

2

3

4

5

6

7

8

9

10    Q.

11

12

13

14

15    A.

16

17

18    Q.    Is it fair to say that your major

19          disagreement with RLI is the manner in

20          which they investigated this claim rather

21          than the lack thereof?

22                MR. PETTAWAY:   Object to the form.

23    A.    I have to say maybe the manner.

120

1   Q.  The manner.  So is it fair to say that you

2        think that RLI did investigate this claim?

3   A.  I mean, I can't say to the -- to judge on

4        the standards of investigation, you know,

5        how they investigated this one as compared

6        to the way they investigated another claim

7        from another city, to judge on, you know,

8        whether or not they did an, you know,

9        effective job as compared to what they

10        would do with all cities or just with our

11        city.  But ...

12   Q.  Before we filed this lawsuit did I come

13        down here and meet with you about this

14        claim?

15   A.  Yes, you did.

16   Q.  We spent about how long?

17   A.  Couple of hours.

18   Q.  Couple of hours?

19   A.  Yeah.

20   Q.  And you and I have talked on the phone

21        several times prior to this lawsuit being

22        filed?

23   A.  Uh-huh (positive response).

121

```
1    Q.   And you and I have traded documents.  I've
2         written you letters and you've sent stuff
3         back to me in response; is that correct?
4    A.   Uh-huh (positive response).
5    Q.   Would you agree with me that that could be
6         considered a form of an investigation?
7    A.   Uh-huh (positive response).  So the
8         question I have, you said that bad -- I
9         mean, you said that lack of investigation
10        was one.  What was -- the only case that
11        specified, you know, what grounds it was
12        based on ...
13   Q.
14
15
16
17   A.
18   Q.
19   A.
20
21
22   Q.
23
```

122

1

2          What I want to know is do you think

3       that we investigated the claim; yes or no?

4    A.   Well, I feel like y'all investigated it.

5    Q.

6

7

8

9    A.

10

11

12

13

14

15   Q.

16   A.

17

18

19

20

21

22

23

123

1              (Deposition concluded at

2              approximately 11:00 a.m.)

3              * * * * * * * * *

4         FURTHER DEPONENT SAITH NOT

5              * * * * * * * * *

6            REPORTER'S CERTIFICATE

7    STATE OF ALABAMA:

8    MONTGOMERY COUNTY:

9             I, Tracye Sadler, Certified Court

10   Reporter and Commissioner for the State of Alabama

11   at Large, do hereby certify that I reported the

12   deposition of:

13              **WILLIAM SCOTT**

14   who was duly sworn by me to speak the truth, the

15   whole truth and nothing but the truth, in the

16   matter of:

17              RLI INSURANCE COMPANY,

18              Plaintiff/Counterclaim Defendant,

19              vs.

20              TOWN OF MOSSES, ALABAMA, and

21              ALICIA SHUFORD-GORDON,

22              Defendants/Counterclaim Plaintiffs,

23              IN THE UNITED STATES DISTRICT COURT

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

124

1          FOR THE MIDDLE DISTRICT OF ALABAMA

2     NORTHERN DIVISION

3          Case Number 2:07-cv-00230-WKW-SRW

4     on October 1, 2007.

5          The foregoing 123 computer-printed pages

6     contain a true and correct transcript of the

7     examination of said witness by counsel for the

8     parties set out herein.  The reading and signing of

9     same is hereby waived.

10          I further certify that I am neither of

11    kin nor of counsel to the parties to said cause nor

12    in any manner interested in the results thereof.

13          This 26th day of October 2007.

14

15

16

17    Tracye Sadler, Certified
      Court Reporter, ACCR No. 294,
18    and Commissioner for the State
      of Alabama at Large

19

20

21

22

23